# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MAKI TYNER,                          )
                             Plaintiff,       )
                v.                          )     Case No. 5:21-cv-00608-F
                                 )
HEALTH IQ INSURANCE                  )
SERVICES, INC.,                      )
                                 )
                   Defendant.       )

**DEFENDANT HEALTH IQ INSURANCE SERVICES, INC.'S MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ........................................................... 2

    I.     Health IQ's Internal Policies, Procedures, and Training ...................... 2

    II.    Plaintiff Provided Consent for Telemarketing Calls............................... 3

    III.   Health IQ Purchased the Lead Containing Plaintiff's Number ........... 10

    IV.   Health IQ's Calls to Plaintiff ............................................................... 11

    V.    Plaintiff's Individual Causes of Action............................................... 13

          A.    47 U.S.C. § 227(b) ................................................................. 14

          B.    47 U.S.C. § 227(c) & 47 C.F.R. §§ 64.1200............................ 14

ARGUMENT ...................................................................................................... 15

    I.     Plaintiff's Unrevoked Consent is a Complete Bar to Her TCPA Claims ............ 16

    II.    The Prerecorded Voicemail Messages Do Not Violate the TCPA And Do Not Present a Valid Injury Upon Which a Claim Can Be Made ................................ 18

          A.    The Voicemail Messages Are Not Prerecorded Messages Under the TCPA ................................................................................... 18

          B.    Plaintiff Suffered No Injury From the Voicemails and Thus Has No Claim................................................................................... 20

    III.   Health IQ's Safe Harbor Defense ....................................................... 22

CONCLUSION................................................................................................... 26

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anders v. Walmart, Inc.*,
 2021 WL 6135568 (W.D. Okla. Dec. 29, 2021)......................................................16

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).................................................................................................16

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986).................................................................................................16

*Charvat v. GVN Mich., Inc.*,
 561 F.3d 623 (6th Cir. 2009) ..................................................................................15

*Collins v. Sonic Corp.*,
 2022 WL 2298194 (W.D. Okla. June 22, 2022)................................................14, 15

*Daubert v. NRA Group, LLC*,
 861 F.3d 382 (3d Cir. 2017).....................................................................................14

*Garry v. NewRez, LLC*,
 2022 WL 1619592 (M.D. Fla. Mar. 7, 2022) ..........................................................17

*Johansen v. Efinancial LLC*,
 2021 WL 7161969 (W.D. Wash. June 11, 2021)............................................. *passim*

*Krakauer v. Dish Network, L.L.C.*,
 925 F.3d 643 (4th Cir. 2019) ..................................................................................15

*Lucoff v. Navient Sols., LLC*,
 981 F.3d 1299 (11th Cir. 2020) ...............................................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986).................................................................................................16

*Moser v. FCC*,
 46 F.3d 970 (9th Cir. 1995) ....................................................................................19

*Moskowitz v. Am. Sav. Bank, F.S.B.*,
 37 F.4th 538 (9th Cir. 2022) ...................................................................................17

*Panzarella v. Navient Sols., Inc.*,
 37 F.4th 867 (3d Cir. 2022) ....................................................................................19

*Physicians Healthsource, Inc. v. Cephalon, Inc.*,
   954 F.3d 615 (3d Cir. 2020)............................................................17

*Shotgun Delivery, Inc. v. United States*,
   269 F.3d 969 (9th Cir. 2001) ........................................................22

*TransUnion v. Ramirez*,
   141 S. Ct. 2190 (2021)..................................................................21

*True Health Chiropractic, Inc. v. McKesson Corp.*,
   896 F.3d 923 (9th Cir. 2018) ........................................................17

*Ybarra v. DISH Network, LLC*,
   807 F.3d 635 (5th Cir. 2015) ...................................................19, 20

**Statutes**

Telephone Consumer Protection Act ("TCPA") 47 U.S.C. § 227....................................... *passim*

47 U.S.C. § 227(b) ............................................................................14

47 U.S.C. § 227(b)(1)(B) ...............................................................14, 18

47 U.S.C. § 227(b)(3) ........................................................................14

47 U.S.C. § 227(b), (c) .......................................................................16

47 U.S.C. § 227(c) ............................................................................14

47 U.S.C. § 227(c)(5) ........................................................................15

**Other Authorities**

47 C.F.R. §§ 64.1200 ........................................................................14

47 C.F.R. § 64.1200(c)(2)(i)(A)-(E) ...........................................22,  23, 25

47 C.F.R. § 64.1200(c)(2)(ii) ...............................................................17

47 C.F.R. §§ 64.1200(d)(3),(6) .............................................................15

Fed. R. Civ. P. 56...........................................................................1, 2, 16

Fed. R. Civ. P. 56(a) ........................................................................16

Defendant Health IQ Insurance Services, Inc. ("Health IQ"), by and through its undersigned counsel, respectfully submits this memorandum of law in support of its motion for summary judgment on Plaintiff Maki Tyner's individual claims pursuant to Federal Rule of Civil Procedure 56. In support thereof, Health IQ states as follows:

## PRELIMINARY STATEMENT

It is undisputed that Plaintiff Maki Tyner submitted a web form asking to receive telemarketing calls concerning insurance products and, based on that form, Health IQ called her regarding insurance products. On that record, Plaintiff asserts three causes of action under the Telephone Consumer Protection Act ("TCPA"), but the undisputed record confirms that each of Plaintiff's individual claims must fail and thus should be dismissed.

On March 2, 2021, Plaintiff visited the website www.FlashRewards.us (the "Website"), submitted her personal information, and provided compliant consent to receive telemarketing calls from the Website and its marketing partners about insurance products and services. In response, Health IQ called Plaintiff about insurance products and services. Plaintiff's undisputed consent stands as a basis for dismissal of her claims as a matter of law.

In addition to that consent, the record confirms additional bases upon which Plaintiff's claims must fail. First, Plaintiff alleges that she received prerecorded voicemail messages from Health IQ that violate the prerecorded message requirements of the TCPA, but the messages she alleged to have been received fall outside the limited scope of the statute and, even if they were covered, cannot stand as a valid basis for recovery for Plaintiff. Second, Health IQ's well-established, robust practices, procedures, and training implemented consistent with the TCPA provide a safe harbor against Plaintiff's DNC claims. No reasonable jury could find otherwise.

1

For each of these reasons, summary judgment under Rule 56 is appropriate as to each of Plaintiff's individual claims against Health IQ.

## STATEMENT OF UNDISPUTED FACTS

The following sets forth the undisputed factual record concerning Plaintiff's individual claims:

### I.   HEALTH IQ'S INTERNAL POLICIES, PROCEDURES, AND TRAINING

1.      Health IQ implemented reasonable policies, practices, procedures, and training to prevent telemarketing inconsistent with controlling law, including the TCPA, requirements of the National Do Not Call Registry, and relevant restrictions imposed by federal and state law concerning consumer telemarketing. (*See, e.g.,* Ex. A (Response to Interrogatories) at No. 9; Ex. B (Health IQ Telemarketing Policies) at HIQ-TYNER-00000379-394.)

2.      As necessary and appropriate, Health IQ took steps to ensure that the calls it made were to consumers that had provided their prior express written consent to receive calls, including if their number was on the national Do Not Call Registry ("NDNCR"). (*Id.*)

3.      Specifically, at the time the calls to Plaintiff were placed, Health IQ had implemented policies, procedures, and training for compliance with the requirements of the Do Not Call Registry and relevant provisions of the Telephone Consumer Protection Act. (Ex. A (Responses to Interrogatories), No. 11; Ex. B (Policies and Procedures) at HIQ-TYNER-00000379-394.) Those policies and procedures were, and remain, an established part of Health IQ's corporate practices. (Ex. B at HIQ-TYNER-00000369- 428.)

4.      Health IQ also required relevant personnel to complete training concerning adherence to telemarketing laws and regulations and maintained records to confirm that training was completed. (*See* Ex. C (2021 Telemarketing Compliance Training) HIQ-TYNER-00000038-

00051, at 0000039-44; Ex. D (Assessment) HIQ-TYNER-00000017-00037, at 20-25, 30-31; s*ee also* HIQ-TYNER-00000001–16 (personnel training records).)

## II.   PLAINTIFF PROVIDED CONSENT FOR TELEMARKETING CALLS

5.      On March 2, 2021, Plaintiff visited the website www.FlashRewards.us, completed a 27-question personal survey, and provided consent for telemarketing calls concerning various products or services, including insurance. (Ex. E (June 7, 2022 Stipulated Facts), ¶ 1).

6.      Plaintiff provided her name, email, date of birth, address, and telephone number. (*Id.* at ¶ 2.)

7.      The Website was running a third-party validation software, which allows the parties to see a re-creation of the consumer interface and experience Plaintiff had on the Website. (Ex. F (Jornaya Guardian TCPA Report) at HIQ-TYNER-00000429-433 (including "Visual Playback Link" at HIQ-TYNER-00000433 (link last visited August 22, 2022).)

8.      The "Video Playback Link" provided in the Jornaya Guardian TCPA Report shows that ██████████████████████████████████████████████████ ████████████████████████

9.      On each screen of the survey, Plaintiff had the option to click ████████████ ██████████████████████████████████████████████████ ██████████████████████████

10.     Throughout her time on the Website, Plaintiff was provided links to the Website's Privacy Policy and Terms of Use in off-set font at the bottom of each page she viewed. (*Id.*)

11.     The web form was completed on ████████████████████████. (Ex. G (HIQ-TYNER-00000052-53) at 53.)

12.     Plaintiff owns an Apple iPhone with Safari browser. (Ex. H (Pl's Response to Interrogatories), No. 5.)

13.     Plaintiff answered the following questions on the Website:











(*available at* link from Ex. D (Jornaya Guardian TCPA Report) at HIQ-TYNER-00000433 (last viewed August 23, 2022).

14.     The last page of the web form showed the following:



(*Id.*; *see also* Ex. E (Stipulated Facts), ¶ 3.)

15.     Plaintiff clicked the green "Continue" button. (Ex. E (Stipulated Facts), ¶ 4.)

16.     If Plaintiff had not clicked that "Continue" button there would not be any Jornaya Compliance Report or Visual Playback Link available. (Ex. F (Jornaya Guardian TCPA Report) at HIQ-TYNER-00000429–433.)

17.     The final screen provided a disclosure of potential telemarketing calls to Plaintiff's telephone number; however, Plaintiff also agreed to receive multiple different types of telemarketing calls during her completion of questions through the survey on the Website. (*Id.*)

**III.   HEALTH IQ PURCHASED THE LEAD CONTAINING PLAINTIFF'S NUMBER**

18.     Soon after Plaintiff completed the web form on the Website, Health IQ purchased a data file that included Plaintiff's telephone number and other relevant information from independent, third-party vendor Enfuego Holdings d/b/a Cege Media ("Cege Media"). (Ex. A (Response to Interrogatories) at No. 3.)

19.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ (*Id.* at No. 3.)

20.     Specifically, Health IQ purchased a lead from Cege Media that included Plaintiff's telephone number as part of a batch of consumer leads entitled "███████████" (*Id.* at No. 2.)

21.     ████████████████████████████████████████████

████████████████████████████████████████. (*Id.*)

22.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ (Ex.

J (Cege-Health IQ Agreement) at HIQ-TYNER-0000054-59.)

23.     The Cege-Health IQ Agreement included the following requirements for any valid consumer leads that Cege Media sold to Health IQ:





(*Id.* at § 1.2.)

24.   Cege Media has provided evidence of Plaintiff's visit to the Website. (*See, e.g.*, Ex. J (CEGE-000047); *see also* Ex. A (Response to Interrogatories) at No. 5.)

25.   It is undisputed that Plaintiff visited the Website and submitted her personal information consenting to receive telemarketing calls concerning insurance products from the Website and its marketing partners. (Ex. E (Stipulated Facts), ¶¶ 1–2.)

## IV.   HEALTH IQ'S CALLS TO PLAINTIFF

26.   Health IQ's calls to Plaintiff were based on prior express written consent and her inquiry seeking information about insurance products and services; thus, there was no need to scrub Plaintiff's number against the NDNCR. (Ex. A (Responses to Interrogatories), at No. 11.)

27.   Plaintiff alleges that she received two calls where Health IQ "left prerecorded voicemail messages on [her] voicemail." (Ex. H (Pl's Response to Interrogatories), No. 3.)

28.   Plaintiff does not, because she cannot, allege that she ever picked up a ringing telephone and heard a prerecorded voice message from Health IQ. (*See* Dkt. No. 14.)

29.   Health IQ does not permit or use prerecorded messages, IVRs, or avatars in calls answered by live call recipients. (Ex. A (Response to Interrogatories), at No. 2.)

30.   Health IQ also does not permit or utilize so-called "ringless" voicemail messages that would be delivered without a consumer's telephone actually being called. (*Id.*)

31.     During a portion of the relevant time period, Health IQ utilized some pre-recorded voicemail messages that could be played to a consumer's answering machine if a live person failed to answer a call. (*Id.*)

32.     Health IQ only permitted the use of these pre-recorded voicemail messages to numbers where the consumer had provided prior express written consent to receive telemarketing calls, including specific consent to the receipt of pre-recorded voice messages. (*Id.*; Ex. B (Health IQ Telemarketing Policy), at HIQ-TYNER-00000379-394.)

33.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████    (Ex. K (Responses to RFAs), at No. 3.)

34.     The three calls were dispositioned as ████████████████████████ ████████████████████████  meaning these calls may have resulted in a prerecorded message being left on an answering machine after no one answered the call. (Ex. A (Response to Interrogatories), No. 2.)

35.     But Plaintiff alleges receipt of only two such calls (Dkt. No. 14 at ¶ 14 (alleging receipt of prerecorded voice messages on May 24, and May 25, 2021); Ex. H (Pl's Responses to Interrogatories), No. 3) and produced audio recordings of only two calls alleged to be prerecorded voicemail messages. (Ex. H (Pl's Response to Interrogatories), No. 14.)

36.     Health IQ's records do not include any request by Plaintiff to revoke the prior express written consent granted to receive calls. (Ex. A (Response to Interrogatories), at No. 12.)

37.     Upon receipt of Plaintiff's original Complaint in this action, and full telephone number, Health IQ added Plaintiff's telephone number to its internal Do Not Call list, and there is no evidence that any subsequent calls have been made to her number. (Ex. A (Response to Interrogatories), at No. 12.)

## V.    PLAINTIFF'S INDIVIDUAL CAUSES OF ACTION

38.     Plaintiff asserts three individual claims against Health IQ in the First Amended Complaint. (Dkt. No. 14.)[1]

39.     First, Plaintiff alleges Health IQ placed calls using an artificial or prerecorded voice for a telemarketing call to her cellular telephone number without consent which she alleges is required under the TCPA. (Dkt. No. 14, ¶¶ 58–70.)

40.     Second, Plaintiff alleges that Health IQ failed to honor her request to add her number to Health IQ's internal do not call list. (*Id.* at ¶¶ 71–80.)

41.     Third, Plaintiff alleges that Health IQ called her telephone number without the appropriate level of consent given her listing of that number on the NDNCR. (*Id.* at ¶¶ 81–88.)

42.     Plaintiff alleges no actual damages and seeks only statutory damages. (Dkt. No. 14; Ex. H (Pl's Response to Interrogatories), No. 15 ("I am not seeking damages beyond the statutory damages the TCPA allows."))

43.     Health IQ denies liability (Dkt. No. 20) and asserted relevant affirmative defenses including the dispositive presence of consent, lack of injury, the TCPA safe harbor, and that the calls at issue do not constitute artificial or prerecorded messages under the TCPA. (*Id.* at 13-19.)

---

[1]     As the Court is aware, Plaintiff originally filed suit with a co-plaintiff, Tara Armado; however, Ms. Armado's claims were dismissed by this Court, after a contested motion, for lack of personal jurisdiction. (Dkt. No. 19.)

44.     Consistent with the Court's January 7, 2022 Order, all fact discovery through July 21, 2022 was limited to Plaintiff's individual claims. (Dkt. No. 23.) This motion timely follows.[2]

<u>**RELEVANT STATUTORY FRAMEWORK**</u>

The Telephone Consumer Protection Act seeks to regulate the use of some practices in connection with telemarketing to residential subscribers. 47 U.S.C. § 227, *et seq*. The statute provides a private cause of action for some, but not all, telemarketing calls. 47 U.S.C. § 227(b)(3).

**A.  47 U.S.C. § 227(b)**

The TCPA regulates certain uses of artificial or prerecorded voice messages. Specifically, the TCPA states that it "shall be unlawful for any person within the United States . . . to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," unless such number was obtained through means permitted by the Act. 47 U.S.C. § 227(b)(1)(B). Among the calls "[e]xcepted from this proscription are calls made with the 'prior express consent of the called party.'" *Daubert v. NRA Group, LLC*, 861 F.3d 382, 389 (3d Cir. 2017).

**B.  47 U.S.C. § 227(c) & 47 C.F.R. §§ 64.1200**

The TCPA also includes requirements concerning handling of consumers' requests to not receive telemarketing calls. "Section 227(c) of the TCPA instructs the Federal Communications Commission ('FCC') to promulgate regulations to establish and operate a national database of telephone numbers of people who object to receiving telephone solicitations, and permits the FCC to prohibit telephone solicitations to any number in the database." *Collins v. Sonic Corp.*, 2022 WL 2298194, *2 (W.D. Okla. June 22, 2022) (Dishman, J.) (citing 47 U.S.C. § 227(c)). "The FCC

---

[2]     Consistent with the Court's January 7, 2022 Order, this motion addresses Plaintiff's individual causes of action without waiver or concession of Health IQ's ability to, if necessary, defend or move as to Plaintiff's meritless class allegations at the appropriate time. (Dkt. No. 23.)

promulgated these regulations that, in general, prohibit 'telemarketers from placing telephone calls to residential telephone subscribers without following certain procedures.'" *Id.* (quoting *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 628–29 (6th Cir. 2009)). Additionally, if a consumer requests that a telemarketer not contact them, callers must honor a person's "do-not-call" request and must maintain a list of such do-not-call requests for five years. 47 C.F.R. §§ 64.1200(d)(3),(6). Subject to specific exceptions, a residential subscriber may have a claim under this section of the TCPA if that individual "has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under" 47 U.S.C. § 227(c)(5).

Simply adding a telephone number to the NDNCR does not bar all telemarketing calls. *See, e.g., Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019) ("The statute marks its own boundary. Suit can only be brought by those who receive multiple violative calls."); *see also, e.g., Johansen v. Efinancial LLC*, 2021 WL 7161969, *6 –*9 (W.D. Wash. June 11, 2021), *R. & R. adopted*, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022) (dismissing claims presented by consumer that provided consent to be called because they fall outside § 227(c)(5)).

## ARGUMENT

Health IQ is entitled to summary judgment on Plaintiff's claims because: (1) Plaintiff undisputedly consented to receive the calls and never revoked that consent, which defeats both the prerecorded voice and do not call claims; (2) the prerecorded voice claim fails because the voicemail messages allegedly received do not violate the TCPA and, even if they did, cannot stand as a basis for a valid claim; and (3) the do not call claims fail because of Health IQ's compliance with the safe harbor provisions of the TCPA. Thus, Health IQ is entitled to dismissal of all Plaintiff's individual claims.

Summary judgment is appropriate where the "movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The court must construe the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); however, Plaintiff must do more than simply dispute individual facts to defeat this motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Summary judgment is appropriate when no reasonable jury could return a verdict for the plaintiff. "A dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anders v. Walmart, Inc.*, 2021 WL 6135568, *1 (W.D. Okla. Dec. 29, 2021) (Friot, J.) (internal citation omitted). "A fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.* (internal citation omitted). There is no genuine dispute regarding material facts in this case; rather, the record confirms that no reasonable jury could find for Health IQ. Thus, summary judgment under Rule 56 is warranted.

I. **PLAINTIFF'S UNREVOKED CONSENT IS A COMPLETE BAR TO HER TCPA CLAIMS**

Plaintiff stipulated that she completed the Website's web form providing prior express written consent to receive telemarketing calls, including concerning insurance products and services from the Website or its marketing partners. (Ex. E (Stipulated Facts).) There is no evidence in the record that Plaintiff revoked her consent. Thus, all Plaintiff's TCPA claims fail as a matter of law. 47 U.S.C. § 227(b), (c).

Consent is a complete defense to any claim under the Telephone Consumer Protection Act. *See, e.g., Moskowitz v. Am. Sav. Bank, F.S.B.*, 37 F.4th 538, 541 (9th Cir. 2022); *see also True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). Summary judgment on TCPA claims is appropriate when consent is established. *Lucoff v. Navient Sols., LLC*, 981 F.3d 1299, 1306 (11th Cir. 2020). There is no liability under the TCPA if the caller has "the subscriber's prior express invitation or permission" that is "evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." 47 C.F.R. § 64.1200(c)(2)(ii); *see also Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 621 (3d Cir. 2020) ("The plain language of the TCPA shows that 'express consent' and 'express invitation or permission' are interchangeable.") Here, the stipulated facts confirm that Plaintiff provided consent to receive the telemarketing calls at issue.

Plaintiff's undisputed consent to receive telemarketing calls is dispositive of her claims. Specifically, Plaintiff stipulated that on March 2, 2022, she provided prior express written consent to receive telemarketing calls concerning insurance products, including from third-party companies, via the Website (Ex. E (Stipulated Facts), ¶¶ 1–2.) That Plaintiff then received telemarketing calls concerning insurance products from such third-party entities does not, and cannot, stand as a valid basis for a cause of action under the TCPA. *See, e.g., Moscowitz*, 37 F.4th at 542 (affirming summary judgment based upon consent because it is an absolute defense to a TCPA claim); *Lucoff*, 981 F.3d at 1306 (same); *Garry v. NewRez, LLC*, 2022 WL 1619592 (M.D. Fla. Mar. 7, 2022) (granting summary judgment where the plaintiff consented to receive prerecorded calls).

17

There is no genuine issue of material fact that Plaintiff requested telemarketing calls concerning insurance products from the Website's owner and its third-party marketing partners. (Ex. E (Stipulated Facts), ¶ 3 (consenting to calls "from CAC and our Marketing Partners").) That lead was sold to Cege Media who sold it to Health IQ and, in response, Health IQ placed telemarketing calls to Plaintiff about insurance products. (Ex. A (Response to Interrogatories), No. 3.) Plaintiff's consent is dispositive. No reasonable jury could find that Plaintiff sets forth a violation of the TCPA. Rather, because the parties agree that Health IQ's calls to Plaintiff's number were made on the basis of unrevoked prior express written consent, each of her three causes of action must fail as a matter of law and summary judgment is appropriate.

## II. THE PRERECORDED VOICEMAIL MESSAGES DO NOT VIOLATE THE TCPA AND DO NOT PRESENT A VALID INJURY UPON WHICH A CLAIM CAN BE MADE

If Plaintiff's claims are not dismissed on the basis of consent, there are separate and independent bases upon which the Court should dismiss each Count. The Court must dismiss Plaintiff's prerecorded voice claim, asserted in Count I, for the separate and independent reason that the calls at issue are not prohibited by TCPA Section 227(b)(1)(B), and even if they are, Plaintiff undisputedly presents no injury upon which a claim could be based.

### A. The Voicemail Messages Are Not Prerecorded Messages Under the TCPA

Because Health IQ used prerecorded messages solely in the context of voicemails after a live person failed to answer a ringing call, the calls at issue fall outside the prerecorded message provisions of the TCPA.[3] Section 227(b)(1)(B) of the TCPA states that "**It shall be unlawful** for

---

[3]     Health IQ assumes for purposes of this motion that the calls dispositioned as potentially including a prerecorded voicemail message qualify as "calls" under the TCPA and would need to otherwise satisfy any potential arguments concerning Automatic Telephone Dialing System or Do Not Call provisions. Rather, these calls fall outside the limited definition for the type of prerecorded voice calls prohibited by the TCPA.

any person within the United States, or any person outside the United States if the recipient is within the United States— . . . (B) **to initiate any telephone call** to any residential telephone line **using an artificial or prerecorded voice** to deliver a message **without the prior express consent of the called party**, . . . ." (emphasis added). Plaintiff's claim fails to meet that standard because the calls were not initiated as artificial or prerecorded voice calls.

The TCPA does not prohibit all uses of prerecorded voice messages. *See, e.g, Moser v. FCC*, 46 F.3d 970, 975 (9th Cir. 1995) (approving "the use of taped messages introduced by live speakers"). Here, Health IQ did not "initiate any telephone call . . . using an artificial or prerecorded voice." Rather, each call to Plaintiff was made in the hope that Ms. Tyner would answer the call and she could engage in a discussion about insurance products with a live Health IQ agent. That, by definition, is not a call *initiated using* an artificial or prerecorded voice. In *Ybarra v. DISH Network, LLC,* the Court of Appeals for the Fifth Circuit addressed this question and held that "making a call in which a prerecorded voice might, but does not, play is not a violation of the TCPA. Instead, the prerecorded voice must 'speak' during the call." 807 F.3d 635, 641 (5th Cir. 2015). If the prerecorded voice is never "used" then no violation has occurred. *Id.*  Where, as here, the call was initiated in hopes of connecting with a live consumer and then a prerecorded message might or might not play, that call was not "initiated using an artificial or prerecorded voice." *See also Panzarella v. Navient Sols., Inc.*, 37 F.4th 867 (3d Cir. 2022) (affirming dismissal based on parallel reasoning applied to the ATDS provision in holding that no violation of the TCPA occurred because calls were made on software with the capacity to produce or call randomly or sequentially, but those features were not actually used). Because the record confirms that the calls

19

at issue were not initiated using a prerecorded message, no reasonable jury could find a violation of the TCPA has occurred and summary judgment is warranted.[4]

### B.   **Plaintiff Suffered No Injury From the Voicemails and Thus Has No Claim**

From the consumer's perspective, once the phone stops ringing and goes to voicemail, it is immaterial whether a voicemail is pre-recorded or is left by a live person reading a script because the individual receiving the message did not actually answer the call, and therefore is unable to personally interact with the caller under either scenario. The consumer's experience is identical. The message they receive would be the same, including in terms of length and content. Further, because the recorded message here was a human voice actor reading the scripted message (not some computerized avatar), Plaintiff had no ability to definitively confirm (absent discovery in this litigation) whether the messages she received were a recording or an agent reading the script into her voicemail. (Ex A (Response to Interrogatories), No. 8.) Thus, even if Plaintiff could establish that such a recorded message is a technical violation of the TCPA (it is not), her claims still fail for lack of injury from the prerecorded voicemail messages that she received.

At most, Plaintiff asks this Court to permit her to proceed on a technical violation of the TCPA for which she suffered no injury. (Ex. H (Pl's Response to Interrogatories), No. 15 ("I am not seeking damages beyond the statutory damages the TCPA allows.") That is insufficient to

---

[4]      While Plaintiff seeks recovery for two prerecorded voicemail messages, Health IQ's calling records show three calls dispositioned as potentially resulting in such a message. Plaintiff's failure to produce any recording that aligns with the May 26, 2021 call log record showing a disposition of ███████████ raises the question of whether that third call actually involved a completed voicemail message. If the message did not play, then no claim could be asserted. *Ybarra,* 807 F.3d at 641. Thus, that disconnect between the call logs and Plaintiff's allegations undermines Plaintiff's ability to rely on Health IQ's records as evidence for establishing a completed call to Plaintiff—and, should the case continue, undermines any ability to confirm any putative class member received a completed call, much less a prerecorded voicemail message.

maintain a claim. The Supreme Court has confirmed that bald, unsupported accusations of statutory violations are insufficient to establish standing for a consumer's claim. In *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), the Court rejected the proposition that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 141 S. Ct. at 2205. In reversing and remanding, the Supreme Court directed that "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court [. . .] Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Id.* at 2206 (internal citation omitted). Where, as here, a consumer argues for liability under facts that confirm the consumer's experience is identical—whether a prerecorded or live voice message was used on her voicemail—no reasonable jury could find that she sets forth a valid claim.

Health IQ never used prerecorded or artificial voice technology on any of the calls that Plaintiff answered. (Ex. A (Response to Interrogatories) at No. 2.) When Plaintiff answered the phone, she was connected to a live agent. (*Id.*) And, had she answered the ringing phone, that same result would have occurred on each of the calls dispositioned as having resulted in a prerecorded voicemail. Only when Plaintiff did not answer the call and her answering machine picked up the call did Health IQ, in some instances, leave a prerecorded voice message, rather than having an agent read that same scripted language. In response, Plaintiff is "not seeking damages beyond the statutory damages the TCPA allows." (Ex. H (Pl's Response to Interrogatories), No. 15.) Under such circumstances, there is no injury or violation. Summary judgment is warranted as to Count I of the Complaint.

## III.   HEALTH IQ'S SAFE HARBOR DEFENSE

In addition to consent, Plaintiff's do not call claims in Counts II and III must fail because the record evidence confirms that Health IQ established and implemented policies, procedures, training, and recordkeeping procedures that warrant protection under the TCPA's safe harbor defense. Section 227(c)(5)(C) confirms that "[i]t shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." *See also* Dkt. No. 20 at 18 (Affirmative Defense No. 22). Under the TCPA, a company is not liable if:

> (i) It can demonstrate that the violation is the result of error and that as part of its routine business practice it meets the following standards:
>
> (A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;
>
> (B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;
>
> (C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;
>
> (D) Accessing the national do-not-call database. . . .
>
> (E) Purchasing the national do-not-call database. . . .

47 C.F.R. § 64.1200(c)(2)(i)(A)-(E).

While it may remain the goal, perfection is not required by the TCPA. *Johansen*, 2021 WL 7161969 at *11 (*quoting Shotgun Delivery, Inc. v. United States*, 269 F.3d 969, 973–74 (9th Cir. 2001)*.* "Substantial compliance with regulatory requirements may suffice when such requirements are procedural and when the essential statutory purposes have been fulfilled." *Id.* (relying on implementation of "reasonable practices and procedures"). Where a party shows indisputable evidence of routine compliance with TCPA regulations, the party can shelter in the TCPA's safe harbor. *Id.* at *10. In *Johansen,* the court was faced with a company that established procedures

22

"by only calling those who have requested a life insurance quote and consented to be called." *Id.* at *9. Despite the plaintiff's contention that he did not provide consent or request a call concerning insurance, the court confirmed that "the TCPA's safe harbor provisions would still apply" and dismissed the do not call claims. *Id.* at *10 –*11. Faced with a parallel record, the same dismissal is warranted here.

Elements of practices relevant to showing such compliance are: (1) written procedures to comply with the national do-not-call rules, (2) training of personnel on those procedures, (3) maintenance of a list of numbers that the entity cannot contact, (4) an implemented process used to prevent telephone solicitations to any telephone number on any list established in accordance with the national do-not-call rules, and (5) a process to prevent the sale, lease, rental, or purchase of the national do-not-call database except for compliance purposes. *Id.* (citing, e.g., 47 C.F.R. § 64.1200(c)(2)(i)(A)–(E)). The record confirms that Health IQ established each of the required elements to obtain shelter within the TCPA's safe harbor. Because no reasonable jury could find otherwise, summary judgment is appropriate.

**Written Procedures.** Health IQ has established and implemented written procedures to comply with the national do not call rules. (*See* Ex. B (Health IQ Telemarketing Policies), HIQ-TYNER-000000369-000433.) Health IQ implemented a policy that "████████████████████ ████████████████████████████████████████████████████ ████████████████████" (*Id.* at HIQ-TYNER-00000379.) That policy provided procedures for compliance with relevant state and federal telemarketing law. (*Id.*). In particular,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ (*Id.* at HIQ-TYNER-00000380-381.) Health IQ's "External DNC Policy" was

also provided as part of that policy and available for consumers. (*Id.* at HIQ-TYNER-00000388.)[5]

**Relevant Training.** Health IQ's policy establishes a training requirement and Health IQ

produced evidence confirming that such training is part of the company's regular and established

practices. The policy confirms ██████████████████████████████████████

███████████████████████████████████████████ (*Id.* at HIQ-

TYNER-00000388.) Health IQ produced examples of training materials as well as proof that

relevant employees had completed that training, including training that specifically addressed Do

Not Call procedures. (*See* Ex. C (Telemarketing Compliance Training) HIQ-TYNER-00000038-

00051, at 39-44; Ex. D (Assessment) HIQ-TYNER-00000017-37, at 20-25, 30-31.

**Maintenance of an Internal Do Not Call List**. The company's External DNC Policy

confirms that "Health IQ maintains a record of the name and telephone number(s) for consumers

who do not wish to be called. Upon request, consumers' telephone number(s) will be added to

Health IQ's internal Do Not Call List within thirty (30) days of receipt of such request." (Ex. B

HIQ-TYNER-00000388.) And the internal Telemarketing Policy confirms the existence,

maintenance, and use of that list. (*Id*. at HIQ-TYNER-00000380-81, 000382.) In addition, Health

IQ has established recordkeeping procedures to ensure the continuity and preservation of its

internal Do Not Call list, requiring that ████████████████████████████

---

[5]     The record establishes Health IQ's policies were in effect when it called Plaintiff; however, for purposes of establishing this defense, Health IQ also produced evidence that such policies and procedures were well-established and consistent aspects of Health IQ's corporate practices both before and after the calls to Plaintiff. (*See* Ex. B HIQ-TYNER-00000369–433.)

███████ (*Id.* at HIQ-TYNER-00000383.) Specifically, Health IQ's policy requires that "[██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████" *Id.* Health IQ has implemented and maintained an internal DNC list.

**Purchase and Access of National DNC List.** It is undisputed that Health IQ called Plaintiff based on the lead that contained information Plaintiff submitted to the Website seeking telemarketing calls concerning insurance products and services. (Ex. A (Response to Interrogatories) at No. 3; Ex. E (Stipulated Facts).) That lead (and not any internal or external DNC list) was Health IQ's source of Plaintiff's telephone number. (*Id.*) Through its contract with Cege Media, no lead could be produced to Health IQ without verification of its compliance with the TCPA—further supporting the precautions undertaken by Health IQ. (*See* Ex. J (Cege-Health IQ Agreement) at HIQ-TYNER-0000054–59.) However, Health IQ also had access to the NDNCR for scrubbing, as needed and appropriate. (Ex. B (Telemarketing Policy) at HIQ-TYNER-00000380–81, 88.)

Where, as here, a company has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the TCPA it warrants protection under the TCPA safe harbor provision. 47 C.F.R. § 64.1200(c)(2)(i)(A)-(E). That is true even in the face of a consumer that alleges they were called in error or after raising a factual allegation that they did not provide consent to be called. *See, e.g., Johansen,* 2021 WL 7161969 at *10 –*11. Consistent with its policies, procedures, and vendor agreement, Health IQ called Plaintiff on the basis of her request at the Website seeking information about insurance products. (Ex. A (Response to Interrogatories), No. 7). However, even if Plaintiff disputes that consent, Health IQ is entitled to protection against any do-not-call claim by the TCPA's safe harbor

provision. *Id.* at *10 (dismissing where the company's "internal procedures in fact had prevented calls to Plaintiff except for the call initiated because of the internet request at issue in this case"). Health IQ is entitled to summary judgment on Plaintiff's do not call claims in Counts II and III.

## **CONCLUSION**

For the forgoing reasons, Health IQ respectfully requests that the Court dismiss each of the claims in Plaintiff's Complaint as a matter of law.

Respectfully submitted,

FOX ROTHSCHILD LLP

*/s/ Paul A. Rosenthal*
Paul A. Rosenthal (*pro hac vice*)
49 Market Street
Morristown, NJ 07960
(973) 548-3388
prosenthal@foxrothschild.com

Mark Banner, OBA #13243
320 S. Boston Ave, Suite 200
Tulsa, OK 74103-3706
(918) 594-0400
mbanner@hallestill.com

*Attorneys for Defendant, Health IQ Insurance Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of August, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filings to all counsel of record.


<u>*/s/ Paul A. Rosenthal*      </u>
Paul A. Rosenthal