## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

MAKI TYNER, individually and on )
behalf of all others similarly situated, )
)
        Plaintiffs, )
)
-vs- )      Case No. CIV-21-608-F
)
HI.Q, Inc. d/b/a HEALTH IQ, INC., )
)
        Defendant. )

## <u>ORDER</u>

Plaintiff Maki Tyner (Tyner), individually and on behalf of all others similarly situated, brings this putative class action against defendant Hi.Q d/b/a Health IQ, Inc. (Health IQ), seeking injunctive relief and statutory damages for alleged violations of the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227, *et seq*.  According to the First Amended Class Action Complaint (Complaint), Health IQ, in a 12-month period, placed more than one unsolicited telemarketing call using an artificial or prerecorded voice to the cellular telephones of Tyner and other members of the putative class.  The telephone numbers to which the telemarketing calls were placed were for personal use only and were registered on the national do-not-call registry. The unsolicited telemarketing calls placed by Health IQ to those telephone numbers related to insurance and the Complaint alleges that Tyner and other members of the putative class did not provide prior express written consent for Health IQ to make the telemarketing calls.  After the calls were received, Tyner and members of the putative class requested to opt-out of the telemarketing calls, but the calls continued because the company did not implement

a written policy for maintaining an internal do-not-call list and did not train its personnel on the existence and use of the internal do-not-call-list.  The Complaint alleges that Health IQ's conduct violated the TCPA and the implementing regulations (TCPA regulations or TCPA regulation), specifically, 47 U.S.C. § 227(b) and 47 C.F.R. § 64.1200(a) (Count I); 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d) (Count II); and 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c) (Count III).

Health IQ has moved for summary judgment with respect to Tyner's individual claims.  Doc. no. 33.  Health IQ contends it is entitled to summary judgment because (1) Tyner provided TCPA-compliant consent to receiving the telemarketing calls; (2) the prerecorded voicemail messages received by Tyner fall outside the scope of the TCPA, but even if they fall within the statute's scope, they cannot serve as a valid basis for recovery for Tyner; and (3) Health IQ's established practices, procedures and training provide the company with a safe harbor defense against Tyner's do-not-call claims.

Tyner has responded, opposing summary judgment with respect to Count I and Count III.  Doc. no. 37.[1]  Health IQ has replied.  Doc. no. 40.  With leave of court, Tyner has sur-replied.  Doc. no. 48.  Upon due consideration of the parties' submissions, the court makes its determination.

I.

*TCPA Provisions and TCPA Regulations at Issue*

Count I of the Complaint alleges that Health IQ's conduct violated 47 U.S.C. § 227(b) and 47 C.F.R. § 64.1200(a).  Specifically, it alleges that Health IQ's

---

[1] In her briefing, Tyner states that "[t]o streamline the issues before the Court, Plaintiff hereby abandons Plaintiff's Count II alleging violations of the TCPA's [47 U.S.C. § 227(c)] and 47 C.F.R. § 64.1200(d) requirements, alleged at [DE 14] ¶¶ 71-80."  Doc. no. 37, ECF p. 8.  Based upon Tyner's statement, the court deems the Complaint as amended under Rule 15, Fed. R. Civ. P., to dismiss Count II.

conduct violated TCPA provisions, 47 U.S.C. § 227(b)(1)(A)(iii) and 47 U.S.C. § 227(b)(1)(B), and TCPA regulations, 47 C.F.R. § 64.1200(a)(1)(iii), 47 C.F.R. § 64.1200(a)(2) and 47 C.F.R. § 64.1200(a)(3).

TCPA provision 47 U.S.C. § 227(b)(1)(A)(iii) prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service. . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

TCPA provision 47 U.S.C. § 227(b)(1)(B) prohibits "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party . . . ." 47 U.S.C. § 227(b)(1)(B).

TCPA regulation 47 C.F.R. § 64.1200(a)(1)(iii) prohibits "initiat[ing] any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using . . . an artificial or prerecorded voice[.]" 47 C.F.R. § 64.1200(a)(1)(iii).

TCPA regulation 47 C.F.R. § 64.1200(a)(2) prohibits "[i]nitiat[ing], or caus[ing] to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using . . . an artificial or prerecorded voice, . . . other than a call made with the prior express written consent of the called party . . . ." 47 C.F.R. § 64.1200(a)(2).

TCPA regulation 47 C.F.R. § 64.1200(a)(3) prohibits "[i]nitiat[ing] any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party . . . ." 47 C.F.R. § 64.1200(a)(3).

TCPA provision 47 U.S.C. § 227(b)(3) provides a private right of action for violation of the subsection and the regulations prescribed under the subsection.

Count III of the Complaint alleges that Health IQ's conduct violated 47 U.S.C. § 227(c) and 47 U.S.C. § 64.1200(c).

TCPA regulation 47 C.F.R. § 64.1200(c)(2)(ii) prohibits initiating any "telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government . . . Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating" the regulation if "[i]t has obtained the subscriber's prior express invitation or permission.  Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed[.]"  47 C.F.R. § 64.1200(c)(2)(ii).

TCPA regulation 47 C.F.R. § 64.1200(e) provides that the rules set forth in § 64.1200(c) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers . . . ."  47 C.F.R. § 64.1200(e).

TCPA provision 47 U.S.C. § 227(c)(5) provides a private right of action to a person "who has received more than one telephone call within any 12-month period on or on behalf of the same entity in violation of the regulations prescribed under this subsection[.]"  47 U.S.C. § 227(c)(5).

II.

*Standard of Review*

"A party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." Rule 56(a), Fed. R. Civ. P.  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id*.

4

If the moving party does not have the ultimate burden of persuasion at trial, that party "has both the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law." Pelt v. Utah, 539 F.3d 1271, 1280 (10th Cir. 2008). The moving party can satisfy its initial burden of production "either by producing affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the nonmoving party does not have enough evidence to carry [her] burden of persuasion at trial." *Id*. (quotation omitted). Once the moving party meets its initial burden, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." Concrete Works of Colo., Inc. v. City & Cty. of Denver, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The nonmoving party may not rest solely on allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

If the moving party has the burden of persuasion at trial, "a more stringent summary judgment standard applies." Pelt, 539 F.3d at 1280. In that instance, the moving party "cannot force the nonmoving party to come forward with specific facts showing there is a genuine issue for trial merely by point to parts of the record that it believes illustrate the absence of a genuine issue of material fact." *Id*. (alteration, internal quotation marks and citation omitted). "Instead, the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id*. (quotation omitted).

When adjudicating a motion for summary judgment, the court views the evidence and makes all reasonable inferences in the light most favorable to the non-moving party. Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1222 (10th Cir. 2008).

III.

*Prior Express Written Consent or Prior Express Invitation or Permission–*
*Affirmative Defense—Count I and Count III Claims*

Initially, Health IQ contends that Tyner's individual claims are barred because prior to the telemarketing calls, Tyner gave express written consent or express invitation or permission to receiving the calls. Tyner, Health IQ asserts, visited a website, www.flashrewards.us, and completed a multi-page web form. On the form, Tyner provided her name, email, date of birth, physical address, and telephone number. Health IQ asserts on the last page of the form, Tyner checked a box consenting to receive phone sales calls from the website or its marketing partners, on the telephone number provided, even if the telephone number was on a federal or state do-not-call registry. Health IQ states that after Tyner completed the form, it purchased a data file that included Tyner's telephone number and other relevant information from a third-party vendor, Enfuego Holdings d/b/a Cege Media (Cege Media). The agreement between the parties, Health IQ maintains, required that any lead sold by Cege Media to Health IQ must include a prior express written consent for Health IQ to call the consumer, including a call with prerecorded messages, and even if the telephone number is on any federal or state do-not-call list. Because Tyner had completed the web form, and in the absence of evidence that Tyner revoked the consent prior to the telemarketing calls, Health IQ contends that it is entitled to judgment as a matter of law on Tyner's individual TCPA claims.

Lack of express consent is not an element of a plaintiff's prima facie case under the TCPA. Instead, it is a complete affirmative defense. *See*, Moskowitz v. American Savings Bank, F.S.B., 37 F.4th 538, 541 (9th Cir. 2022). Thus, Health IQ must establish, as a matter of law, all essential elements of the defense before Tyner is obligated to bring forward specific facts to rebut it. Pelt, 539 F.3d at 1280. Upon

review, the court finds that Health IQ has not established, as a matter of law, the affirmative defense.

The last page of the web form completed by Tyner stated that "[b]y checking the box below, I request and consent to receive monitored or recorded phone sales calls . . . from CAC and our <u>Marketing Partners</u> on the landline or mobile number I provided even if I am on a federal or State do not call registry."  Ex. E to doc. no. 31 (underline denotes a hyperlink; underline hereinafter omitted).  Health IQ, however, has not proffered any evidence to demonstrate that it qualifies as "CAC" or one of the "Marketing Partners" at the time Tyner completed the web form.[2]

In its briefing, Health IQ, relying upon the Ninth Circuit's decision in <u>Fober v. Management and Technology Consultants, LLC</u>, 886 F.3d 789 (9th Cir. 2018), argues that the web form's failure to specifically identify it as a party is of no consequence.  According to Health IQ, the Ninth Circuit confirmed, under circumstances akin to this case, that a party need not be specifically named on a website for a consumer to validly consent to receiving calls from that party if the call related to the same topic upon which consent was given.

But the circumstances in <u>Fober</u> are plainly distinguishable from the circumstances in this case.  In <u>Fober</u>, the plaintiff completed and submitted a form for enrollment in a health insurance plan.  She provided her phone number on the form, and by signing the form, she authorized the health insurance plan sponsor to disclose her phone number for certain purposes, including the operation of and

---

[2] Although not required to bring forth specific facts given Health IQ's failure to establish the affirmative defense, Tyner has nonetheless proffered a declaration of Jeffrey Richard, the records custodian of Rewards Zone USA LLC, which owned and operated the subject website, declaring that Health IQ was not on the marketing partners list made available to individuals who accessed the website during the relevant time that Tyner accessed the website.  Doc. no. 37-1.  Indeed, according to Mr. Richard, Health IQ was not added to the marketing partners list until January 11, 2022, months after this lawsuit was filed.

quality of her health plan.[3]   The plan sponsor, through the network, disclosed her phone number to a survey company, under contract with the network, and the company placed calls to assess her satisfaction with services of the physician to which the network had assigned her.   The plaintiff filed suit alleging the survey company had violated the TCPA by calling her.   The company moved for summary judgment, arguing that the plaintiff had given prior express consent to being called. The district court granted summary judgment to the survey company, holding that the plaintiff consented to the calls when she submitted the enrollment form.   On appeal, the plaintiff, argued in part, that the calls to her fell outside the prior express consent exception because the survey company had not demonstrated that it called the plaintiff on the plan sponsor's behalf.   The Ninth Circuit rejected the argument stating:

> There is no statutory or logical basis for imposing such a requirement.   The TCPA aims to curb a particular kind of call: a call that a person *does not expect to receive*.   So the statute's applicability turns entirely on what conduct the called party authorized.   Of course, as a theoretical matter, Plaintiff *could* have authorized only calls made on [the plan sponsor's] behalf.   But that is not what happened. Instead, Plaintiff authorized callers to whom [the plan sponsor] disclosed her information to make a particular type of call—one relating to the quality of Plaintiff's healthcare.   [The survey company] falls within the group of permissible callers, and the calls that it placed were of the kind that Plaintiff agreed to receive.

Fober, 886 F.3d at 794 (emphasis in original).

---

[3] The enrollment form specifically stated: [The plan sponsor entities] . . . *may disclose this information for purposes of* treatment, payment and *health plan operations, including* but not limited to, utilization management, *quality improvement*, disease or case management programs." Fober, 886 F.3d at 791 (emphasis in original).

Health IQ argues that the same analysis "is true" for this case.  Doc. no. 50, ECF p. 7.  The court disagrees.  Unlike the "broad" language of the enrollment form in <u>Fober</u>, the language in the web form at issue does not allow the website to disclose Tyner's information to third parties to make a particular type of call, *i.e.* concerning insurance.  Instead, the language of the web form defines and circumscribes the very small universe of callers from whom Tyner consented to receive sales phone calls on the telephone number provided.   Tyner specifically consented to receive monitored or recorded sales phone calls from "CAC" and the "Marketing Partners." Given that Health IQ has not demonstrated that it qualified as "CAC" or one of the "Marketing Partners" at the time the calls were placed to Tyner, the court concludes that it does not fall within the group of permissible callers and its telemarketing calls were not of the kind that Tyner agreed to receive.

Moreover, the court concludes that the Ninth Circuit's analysis in <u>Fober</u> hinders rather than helps Health IQ.  In its analysis in <u>Fober</u>, the Ninth Circuit recognized a difference in circumstances where "the plaintiff consented to calls from a particular entity and its 'affiliates,' but the defendant, [publisher], was neither that entity nor one of its affiliates."  <u>Fober</u>, 886 F.3d at 794 (quoting and citing <u>Satterfield v. Simon & Schuster, Inc.</u>, 569 F.3d 946, 954-55 (9th Cir. 2009)).  It found such circumstances differed from the circumstances presented in <u>Fober</u> because the <u>Fober</u> plaintiff's consent "contained no such limitation."  <u>Fober</u>, 886 F.3d 789.  Like the consent in <u>Satterfield</u>, Tyner's consent contained a limitation as to the parties from whom she consented to receiving sales phone calls.

The court also carefully notes that TCPA regulation 47 C.F.R. § 64.1200(f)(9) specifically defines the term "prior express written consent" as "an agreement, in writing, bearing the signature of the person called that *clearly authorizes the seller* to deliver or cause to be delivered to the person called advertisements or telemarketing messages using . . . an artificial or prerecorded voice, and the

telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." (emphasis added).  "Seller" is defined in TCPA regulation 47 C.F.R. § 64.1200(f)(10) as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  TCPA regulation 47 C.F.R. § 64.1200(c)(2)(ii) also precludes liability for any telephone solicitation by an entity to a residential telephone subscriber who has registered her telephone number on the national do-not-call registry if that entity has obtained the subscriber's "prior express invitation or permission," which is defined by the regulation as a "signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by *this seller*. . . ." (emphasis added).

The web form at issue did not "clearly authorize" Health IQ to deliver or cause to be delivered to Tyner telemarketing messages using an artificial or prerecorded voice.  Instead, it clearly authorized "CAC" and the "Marketing Partners" to make such calls.  The web form also doesn't state that Tyner agrees to be contacted specifically by Health IQ.  This is no mere technicality.  Because the web form did not clearly authorize Health IQ to deliver or cause to be delivered telemarketing messages using an artificial or prerecorded voice and did not state that Tyner agreed to be contacted by Health IQ, the court concludes that Health IQ is not entitled to summary judgment on Tyner's individual claims alleged in Count I and Count III based on its alleged consent affirmative defense.

IV.

*Count I Claims and Standing*

Health IQ posits another reason to grant summary judgment in its favor as to Tyner's individual claims alleged in Count I.  Specifically, Health IQ posits that the prerecorded voicemail messages it left on Tyner's cellular telephone were not

prohibited by the TCPA, but even if they were, Tyner proffers no injury based on receipt of those messages.  Health IQ asserts that the relevant statute and regulations make it unlawful to "'initiate any telephone call . . . using an artificial or prerecorded voice.'"  Doc. nos. 31 and 33, ECF p. 23.  According to Health IQ, the calls to Tyner were not initiated using a prerecorded voice.  Each call, Health IQ maintains, was made by its agent in the hope that Tyner would answer the call, and she would engage in a discussion with that agent.  Health IQ asserts that the prerecorded voice messages were left only because Tyner did not answer the calls.

Upon review, the court finds that Health IQ is not entitled to summary judgment on Tyner's Count I claims because it has not satisfied its initial burden of production on summary judgment or its ultimate burden of showing that it is entitled to judgment as a matter of law on the Count I claims.

Section 227(b)(1)(B) and section 64.1200(a)(3) do not make it unlawful to initiate a call using a prerecorded voice, as Health IQ claims.  Rather, they make it unlawful for a person or entity to "[i]nitiate" a telephone call "using an artificial or prerecorded voice to deliver a message[.]"  47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3).  The same is true of section 64.1200(a)(2), which makes it unlawful for a person or entity to "[i]nitiate" or "cause to be initiated" a telephone call that "includes or introduces an advertisement or constitutes telemarketing, using . . . an artificial or prerecorded voice."  47 C.F.R. § 64.1200(a)(2).  Health IQ does not dispute that the two calls at issue, although initiated by a live Health IQ agent, "constitute[d] telemarketing" or "deliver[ed]" a telemarking message to Tyner's voicemail.

In addition, although not challenged by Health IQ, Count I of the Complaint also alleges a violation of § 227(b)(1)(A)(iii), which makes it unlawful for a person to "make" a call "using . . . an artificial or prerecorded voice" to a telephone number assigned to a "cellular telephone service[.]"  47 C.F.R. § 227(b)(1)(A)(iii).  Courts,

addressing the matter, have determined that a claim arises under § 227(b)(1)(A)(iii) where a message containing a prerecorded voice was delivered to a voice mailbox. *See*, Susinno v. Work Out World Inc., 862 F.3d 346, 349 (3d Cir. 2017); Lenorowitz v. Mosquito Squad of Fairfield and Westchester County, 2022 WL 4367596, at *5 (D. Conn. Sept. 21, 2022); Alvarado v. Featured Mediation, LLC, 2017 WL 1552248, at *1 (M.D. Fla. May 1, 2017). This makes sense. Robocalls clogging a voice mailbox can be almost as obnoxious as calls the recipient has the misfortune to answer.

The court also rejects Health IQ's "no injury" argument. In essence, Health IQ contends that Tyner lacks standing to bring her § 227(b)(1) and § 64.1200(a) claims because she cannot show an injury in fact, an essential element of standing. Health IQ asserts that after the Supreme Court's ruling in TransUnion LLC v. Ramirez, 141 S.Ct. 2190 (2021), Tyner cannot simply rely on a technical violation of the TCPA to establish standing.

However, Tyner does not simply rely on a technical violation of § 227(b) as her injury in fact. According to Tyner, Health IQ's phone calls were not only a technical violation of the TCPA, but they also constituted an invasion of her privacy or an intrusion upon her seclusion.[4] In Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 462-63 (7th Cir. 2020), *cert. denied*, 141 S.Ct. 2552 (2021), then Circuit Judge Amy Coney Barrett, writing for the Seventh Circuit panel, concluded that the receipt of "unwanted text messages" constituted "concrete harm" sufficient to establish standing for a TCPA § 227(b)(1) claim because the "harm posed by unwanted text messages is analogous" to the kind of harm that the common law tort of intrusion upon seclusion addressed. In TransUnion LLC v. Ramirez, the Supreme Court cited

---

[4] In her Complaint, Tyner alleged that Health IQ's unsolicited prerecorded voice messages caused her harm "including invasion of privacy, aggravation, inconvenience, wasted time, disruption to her daily life, and annoyance." Doc. no. 14, ¶ 33.

with approval the Gadelhak decision.  *See*, TransUnion LLC, 141 S.Ct. at 2204. Based upon the Gadelhak decision, the court is satisfied that Tyner, claiming the receipt of two unsolicited prerecorded voice messages invaded her privacy or intruded on her seclusion, has standing to prosecute her claims under Count I of the Complaint.

V.

*Safe Harbor—Affirmative Defense—Count III Claims*

Lastly, Health IQ contends that it is entitled to summary judgment on Count III of the Complaint—the do-not-call registry claims—based upon its alleged safe harbor affirmative defense.  The record, Health IQ asserts, demonstrates that it established and implemented policies, procedures, training, and recordkeeping procedures to ensure compliance with the national do-not-call rules, warranting protection from liability under the TCPA.  The court disagrees.  Health IQ is not entitled to summary judgment as it has not demonstrated, as a matter of law, all essential elements of its defense.

TCPA provision 47 U.S.C. § 227(c)(5) provides a private right of action for a person who has received more than one telephone call within any 12-month period by or on behalf of an entity in violation of the regulations prescribed under the subsection.  The provision also states that "[i]t shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection."   47 U.S.C. § 227(c)(5).  TCPA regulation 47 C.F.R. 64.1200(c)(2) prohibits any person or entity from initiating telephone solicitation to a "residential telephone subscriber who has registered [her] telephone number on the national do-not-call registry. . . ."  It also provides, however, that any person or entity making the telephone solicitations will not be liable for violating the requirement set forth

in § 64.1200(c)(2) if "[i]t can demonstrate that the violation is the result of error" and that "as part of its routine business practice," it meets certain standards. 47 C.F.R. § 64.1200(c)(2)(i).

Health IQ does not provide any developed argument as to whether the subject calls to Tyner were the "result of error." A party cannot 'claim 'error' simply by showing that it 'meets all other safe harbor criteria . . . .'" Simmons v. Charter Communications, Inc., 222 F.Supp.3d 121, 135 (D. Conn. 2016); see also, Mattson v. New Penn Financial, LLC, 2020 WL 6270907, at *2 (D. Or. Oct. 25, 2020) ("Having adequate procedures in place, in the absence of any error, is insufficient to avoid liability under the safe harbor provision.") (citations omitted).

A defendant can show a telephone solicitation was made in error by showing that the call was made unintentionally. Simmons, 222 F.Supp.3d at 135. One way that the defendant can show that it called unintentionally is by establishing the "procedural breakdowns that led to such calls, as well as the steps that the seller has taken to minimize future errors." Id. (citation omitted). Health IQ has not presented any evidence of procedural breakdowns that led to the telemarketing calls to Tyner.

Although not argued in its motion, it appears based upon other arguments that Health IQ has made, that the company contends that the calls were in error because it had a good faith belief that it had permission to call Tyner. The record reveals that Health IQ obtained Tyner's telephone number by purchasing a bulk lead from Cege Media, a third-party vendor. The agreement between the Cege Media and Health IQ required that any lead data sold to Health IQ must be collected from individuals who have provided express written consent for Health IQ to contact them, including through use of a prerecorded message. According to Health IQ, the lead data obtained from Cege Media included objective markers of validity, including Tyner's personal information, and it was validated by third party software from Jornaya. Based upon these facts, Health IQ believed it had prior express written consent to

14

call Tyner, even though her telephone number was on the national do-not-call registry.

As discussed, the web form completed by Tyner provided that she consented to receive recorded sales calls from "CAC" and the "Marketing Partners." There is no evidence in the record that Health IQ was "CAC" or one of the "Marketing Partners." Indeed, the evidence proffered by Tyner, as previously noted, shows otherwise. Thus, there is no evidence in the record that Health IQ had express written consent from Tyner to call her.

While Health IQ believed that it had permission to call her because of the lead data purchased from Cege Media and the contractual requirement that Cege Media only provide lead data collected from individuals who have provided express written consent for Health IQ to contact them, there is no evidence that Health IQ attempted to verify that Tyner had specifically consented to receive calls from Health IQ prior to making the calls. Health IQ maintains that the lead data it purchased had objective markers, including Tyner's personal information, and that it was validated by third-party software from Jornaya. However, the record reveals that Jornaya's third-party software set forth the language from the web form which specifically provided that Tyner consented to receiving recorded sales calls from "CAC" and the "Marketing Partners." Ex. F to doc. no. 33, ECF p. 4.[5] There is no indication in the record that Health IQ did not possess this third-party software prior to making the telemarketing calls; indeed, it appears otherwise. Further, there is no evidence that Health IQ, after receiving this third-party software showing the absence of express written consent as to calls from the company, attempted to check the national do-not-call registry before making the telemarketing calls to Tyner. And the agreement between Cege

---

[5] The software also reveals a list of companies, which appears to be the "Marketing Partners." Ex. F to doc. no. 33, ECF p. 5. Although Cege Media is listed, Health IQ is not. *Id.*

Media and Health IQ makes no mention of the national do-not-call registry regarding any lead data purchased.

To the extent that Health IQ contends that its calls to Tyner were in error because "'it had a good faith belief that it had permission'" to call Tyner, *see*, Mattson v. New Penn Financial, LLC, 2020 WL 6270907, at *4, the court concludes that a genuine issue of material fact exists as to whether Health IQ had such good faith belief. Upon review of the record in a light favorable to Tyner, the court finds that Health IQ has not established as a matter of law that the telemarketing calls it made to Tyner were unintentional. The court therefore concludes that Health IQ is not entitled to summary judgment on Tyner's claims alleged in Count III of the Complaint.

VI.

*Conclusion*

For the reasons stated, Defendant Health IQ's Motion for Summary Judgment (doc. no. 33) is **DENIED**. This matter shall be set for a status and scheduling conference regarding the putative class claims.

IT IS SO ORDERED this 7th day of December, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0608p015.docx

16